# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>DANIEL TORRES-LONA,<br><br>    Defendant. | No. 06-CR-72-LRR<br><br><br><br>**ORDER** |

*TABLE OF CONTENTS*

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

*II.*   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*  *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*  *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    *A.*    *Findings of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    *B.*    *Conclusions of Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
        *1.*    *Search and seizure* . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
        *2.*    *Miranda warnings* . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*V.*    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

## *I. INTRODUCTION*

The matter before the court is Defendant Daniel Torres-Lona's Response ("Objections") (docket no. 33) to the Report and Recommendation (docket no. 20), which recommends the denial of Defendant's Motion to Suppress ("Motion") (docket no. 10).

## II. PROCEDURAL BACKGROUND

On May 25, 2006, Defendant was charged in a one-count Indictment. Count 1 of the Indictment charges that Defendant knowingly and willfully made a false, fictitious and fraudulent material statement and representation, in that Defendant claimed orally to an agent of the Bureau of Immigration and Customs Enforcement ("ICE") that he had previously worked at a Cedar Rapids business utilizing his assigned Social Security number, when in truth and fact, Defendant knew he had worked at the Cedar Rapids business by utilizing a fraudulent Social Security number, in violation of 18 U.S.C. § 1001.[1]

On June 29, 2006, Defendant filed the Motion, in which he sought to suppress

---

[1] 18 U.S.C. § 1001, in relevant part, provides:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

statements that were made to ICE agents and certain physical evidence seized from his person. On July 3, 2006, the government filed a Resistance.

On July 5, 2006, the magistrate judge held an evidentiary hearing ("Hearing") on the Motion. Defendant was personally present and represented by his attorney, Mark C. Meyer. Assistant United States Attorney Stephanie M. Rose represented the government.

On August 4, 2006, the magistrate judge filed a Report and Recommendation, in which he recommends that Defendant's Motion be denied. On August 18, 2006, Defendant filed timely Objections to the Report and Recommendation. The court finds this matter fully submitted and ready for decision.

### III. STANDARD OF REVIEW

The district court judge is required to make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which a movant objects. 28 U.S.C. § 636(b)(1)(C); *see also United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003). The district court judge may accept, reject or modify, in whole or in part, the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); *see also United States v. Trice*, 864 F.2d 1421, 1424 (8th Cir. 1988). Defendant has made specific, timely Objections to the Report and Recommendation. Therefore, *de novo* review of "those portions of the report or specified proposed findings or recommendations to which objection is made" is required. *See* 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b) (requiring *de novo* review of a magistrate judge's report and recommendation on dispositive motions).

### IV. ANALYSIS

#### A. *Findings of Fact*

In March or April 2006, officers from the Cedar Rapids Police Department ("CRPD") investigated a break-in complaint at the Cambridge Apartment Complex

3

("Complex") located at 2135 North Town, Cedar Rapids, Iowa. During the investigation, CRPD officers found vandalism and fraudulent Social Security documents. Shortly thereafter, they contacted ICE agents regarding their findings. The CRPD officers informed the ICE agents that the apartment they had investigated had been broken into, and it had blood in it, which they believed was the result of a gang's "jumping in" of a new gang member. The CRPD officers explained to the ICE agents that several persons interviewed during the burglary investigation had tattoos that the CRPD officers believed were gang related. During the break-in investigation, the CRPD officers saw the number "13" carved into the wall. They believed such carving was consistent with gang activity. The number "13" is used by Hispanic gangs, particularly Mexican gangs, because "M" is the thirteenth letter of the alphabet and the first letter in the word "Mexico."

After receiving the information from the CRPD officers, ICE Special Agent Christopher Cantrell ("SA Cantrell")[2] and other ICE agents worked with the CRPD officers to obtain documentation from the landlord of the Complex. Specifically, they sought documents that various tenants had provided to the landlord when they rented their respective apartments. The ICE agents determined that some tenants had presented the landlord with counterfeit documents and several tenants had falsely claimed United States citizenship when questioned during the break-in investigation. Based on this discovery, the ICE agents obtained federal search warrants to search several apartments in the Complex. The warrants were based on the belief that persons in the Complex possessed and used counterfeit Social Security and immigration documents.

---

[2] SA Cantrell has had specialized training in the investigation of ethnic gangs. One Hispanic gang SA Cantrell has investigated is the Surenos gang.

On May 23, 2006, the ICE agents executed search warrants at three apartments and obtained consent to search two additional apartments in the Complex. Pursuant to those searches, the ICE agents arrested six undocumented aliens from Mexico. During their searches, the ICE agents found numerous counterfeit Social Security and immigration documents. The names on the documents did not match the people whom the ICE agents arrested on May 23, 2006. While the searches were progressing, SA Cantrell saw a man who was avoiding the ICE agents ("John Doe"). SA Cantrell interviewed John Doe and learned that he was calling some of the Hispanic residents at the Complex to warn them that ICE agents were present.

On May 24, 2006, SA Cantrell and ICE Special Agent Eric Spalding ("SA Spalding") returned to the Complex to continue their investigation. They were looking for Hispanic men in their mid-20's to match the Social Security and immigration documents that they had seized the previous day. SA Cantrell and SA Spalding were also looking for new graffiti.

When they arrived at the Complex, SA Cantrell and SA Spalding found graffiti that had not been there the previous day on the parking lot in front of one of the apartment buildings. The graffiti read, "Sur 13, fuck you." "Sur 13" is a "Surenos gang tag." (H.T. at 11).[3] They also saw Defendant, whom they noted was an Hispanic man in his early 20's, coming out of the back of a restaurant next to the Complex. Defendant was wearing baggy pants, a large cubic zirconium earring, a brown bandana and a cocked flat-billed cap. Based on his experience, SA Cantrell knew that Defendant was dressed consistent with other Hispanic gang members in Eastern Iowa. Neither SA Cantrell nor

---

[3] References to the Hearing Transcript are noted as "H.T."

SA Spalding approached Defendant at that time. SA Cantrell and SA Spalding continued their investigation and saw Defendant once more before they left the Complex.

SA Cantrell and SA Spalding drove away from the Complex. SA Cantrell and SA Spalding, however, quickly decided that they should return to the Complex to interview Defendant because they had seen fresh gang graffiti at the Complex, Defendant was dressed like an Hispanic gang member and one of the purposes of the investigation was to disrupt gang activity.

SA Cantrell drove back to the Complex and stopped his unmarked vehicle near Defendant. SA Cantrell and SA Spalding got out of their vehicle and asked Defendant to speak with them. SA Cantrell was dressed in blue jeans and a t-shirt, and his firearm and badge were conspicuous on his waistband. Defendant walked over to SA Cantrell and SA Spalding, and he stood three to four feet away from them. Without identifying themselves, SA Cantrell and SA Spalding asked Defendant where he was born, and Defendant replied that he was born in Mexico. SA Cantrell asked Defendant if he had any immigration documents. Defendant responded that he did not have immigration documents. SA Cantrell and SA Spalding took Defendant into custody and placed him in handcuffs.

After Defendant was taken into custody, either SA Cantrell or SA Spalding patted him down and obtained his wallet.[4] SA Cantrell looked inside Defendant's wallet and

---

[4] As discussed *infra* Part IV(B)(2), it is unclear how SA Cantrell and SA Spalding obtained Defendant's wallet. It is not clear whether Defendant voluntarily gave it to SA Cantrell and SA Spalding or whether they seized it pursuant to a custodial search of Defendant's person. SA Cantrell testified that he could not remember. (H.T. at 30-31). Giving Defendant the benefit of the doubt, the court finds SA Cantrell and SA Spalding conducted some sort of search and retrieved the wallet from Defendant's person. (*See* H.T. at 15-16 ("[D]uring the encounter and ensuing pat-down, we had come across [Defendant's] wallet and learned that he had a Social Security card that appeared to be
(continued…)

found a Social Security card which displayed number 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 and the name "Daniel Torres." The card was unsigned. SA Cantrell knew, based on his training and experience, that "illegal aliens do not have a valid Social Security number assigned to them and don't have a valid Social Security card." (H.T. at 16). SA Cantrell knew that an illegal alien might have a valid Social Security card if he or she had previously been lawfully admitted into the United States and then deported.

SA Cantrell asked Defendant if the Social Security card belonged to him. Defendant said that the card was valid and was, in fact, his card. SA Cantrell then asked Defendant whether he was employed and, if so, where he worked. The employment question SA Cantrell posed to Defendant is part of a series of questions ICE agents ask suspected illegal aliens for the purpose of processing an undocumented alien. ICE's Form I-213, which is entitled "Record of Deportable/Inadmissible Alien," provides spaces for, among other information, "Name and Address of (Last) (Current) U.S. Employer," "Type of Employment," "Salary" and "Employed from/to." This form was not, however, filled out until Defendant was delivered to the ICE office. Defendant was not given *Miranda* warnings before being asked about his Social Security card and his employment status. According to SA Cantrell, ICE agents generally do not read *Miranda* warnings to suspected illegal aliens when they are being administratively processed for deportation.

When asked about his employment status, Defendant told SA Cantrell and SA Spalding that he had been working at Allside Glass through Sedona Staffing. Sedona Staffing is located about three blocks from the Complex. SA Cantrell and SA Spalding

---

⁴(…continued)
valid . . . .")).

7

drove Defendant, who remained in handcuffs, to that office for further investigation. SA Cantrell went into Sedona Staffing and asked an employee whether Defendant had worked for Sedona Staffing. The employee did not have an employee file under the 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 Social Security number or under the name "Daniel Torres."

Next, SA Cantrell asked SA Spalding to bring Defendant into Sedona Staffing. He did so. The Sedona Staffing employee immediately recognized Defendant when he came into the building and said "hi, Danny." The employee said Defendant last worked at Sedona Staffing in 2003.

SA Cantrell and SA Spalding transported Defendant to the ICE office. En route to the office, SA Cantrell and SA Spalding further questioned Defendant about working for Sedona Staffing. Defendant maintained that he worked there, although Sedona Staffing was unable to locate his employment records. SA Cantrell told Defendant that he did not believe that Defendant was providing accurate information and informed Defendant that there were penalties for providing false information to law enforcement officers.

Upon arriving at the ICE office, Defendant was placed in the area for administrative processing. SA Cantrell advised Defendant of his *Miranda* rights in Spanish and gave Defendant a Form I-214, which is a waiver of rights form that contains a Spanish version of the *Miranda* warnings. Defendant signed the form and stated that he understood his rights. Defendant then asked SA Cantrell how much time he would serve if he had lied to SA Cantrell. SA Cantrell explained to Defendant that the sentence would be a judge's decision. Defendant explained to SA Cantrell that he had lied about his employment with Sedona Staffing. Defendant stated that he had been employed under the name Manuel Torres and had used the Social Security number on the card found in his wallet. SA Cantrell verified this new information with Sedona Staffing.

## B. Conclusions of Law

### 1. *Search and seizure*

Defendant objects to the magistrate judge's failure to address his assertion that ICE agents improperly searched him and seized his wallet in violation of the Fourth Amendment. The record is not clear as to how SA Cantrell and SA Spalding obtained Defendant's wallet. That information, however, is not relevant because Defendant was in custody at the time his wallet was seized. SA Cantrell and SA Spalding had the right to search Defendant and inspect his wallet incident to his lawful arrest.

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *United States v. Robinson*, 414 U.S. 218, 235 (1973). Furthermore, officers have the authority to inspect items discovered on the suspect's person. *Id*. at 236. Because SA Cantrell and SA Spalding had probable cause to believe that Defendant was an illegal alien, they had the authority to place him under arrest, conduct a full search of his person and inspect the wallet found in his pocket. Accordingly, Defendant's objection regarding this initial search is without merit.

### 2. **Miranda** *warnings*

Defendant also objects to the magistrate judge's finding that "Agents Cantrell and Spalding should not have reasonably been aware that the information sought regarding . . . [D]efendant's employment history would be relevant to the offense charged and *Miranda* warnings were not required." Defendant alleges that, once SA Cantrell and SA Spalding found a Social Security card in his possession, their questioning of him was no longer for administrative purposes and, therefore, Defendant should have been advised of his *Miranda* rights before the questioning continued. The court agrees.

"*Miranda* prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). An individual's right to *Miranda* warnings attaches if the person is in "custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. However, not all custodial questioning of a suspect rises to the level of interrogation requiring *Miranda* warnings. *United States v. Reyes*, 908 F.2d 281, 287-88 (8th Cir. 1990) (citing *United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir. 1986)); *see also United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985) (noting that "a request for routine information necessary for basic identification purposes is not interrogation under *Miranda*"). "[I]nterrogation means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Cunningham*, 133 F.3d 1070, 1073 (8th Cir. 1998) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Neither party disputes the fact that Defendant was in custody when he made the statements at issue, but the question remains whether the questioning by SA Cantrell and SA Spalding constituted "interrogation" requiring *Miranda* warnings.

In its Resistance, the government argues that, because deportation proceedings are civil in nature, Defendant did not have the right to receive *Miranda* warnings. In *Mueller v. Mena*, 544 U.S. 93 (2005), ICE agents lawfully detained an occupant in handcuffs for two to three hours while they executed a search warrant because they were searching for weapons and evidence of gang membership and the search warrant was based, in part, on a drive-by shooting. *Id.* at 99-100. The Supreme Court held that there was no Fourth

Amendment violation when ICE agents questioned the occupant about her immigration status—including asking her name, date and place of birth and immigration status. *Id.* at 100-01. No additional reasonable suspicion was needed to ask such questions. *Id.* As the government contends, deportation hearings are civil in nature and do not require that statements from an illegal alien be obtained pursuant to the protections of *Miranda*. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) (holding that, "consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing"); *see also Bustos-Torres v. INS*, 898 F.2d 1053, 1056-57 (5th Cir. 1990) (noting that, because of due process standards, a defendant's involuntary statement cannot be used in a deportation proceeding and explaining that "*Miranda* warnings are not required in the deportation context, for deportation proceedings are civil, not criminal in nature, and the Sixth Amendment safeguards are not applicable"); *United States v. Valdez*, 917 F.2d 466, 469 (10th Cir. 1990) (holding that, because deportation hearings are civil proceedings, an alien does not have a right to *Miranda* warnings); *Trias-Hernandez v. INS*, 528 F.2d 366, 368-69 (9th Cir. 1975) (holding that, because an alien bears the burden of proof at a deportation proceeding and an alien's silence can be used against him during deportation proceedings, *Miranda* warnings would mislead the alien and, therefore, are inappropriate). The government cites several cases in support of its assertion that Defendant did not have a right to the protections of *Miranda*. Each cited case involves deportation hearings. The statements made by Defendant in this case, however, are not to be used by the government in a deportation proceeding but, rather, as proof against him in a criminal case. Accordingly, the court must determine whether Defendant's pre-*Miranda* statements were the result of interrogation by SA Cantrell and SA Spalding, that is, whether they are admissible in Defendant's criminal trial.

SA Cantrell testified that neither he nor SA Spalding gave Defendant *Miranda* warnings because their questions were being posed for processing and administrative purposes and not for the purpose of seeking evidence in a criminal matter. The *Miranda* requirement applies to all custodial interrogations where criminal prosecutions could result, even if the interrogation is administrative in nature. *See Beckwith v. United States*, 425 U.S. 341, 347 (1976) (determining that IRS interrogation of taxpayer suspected of tax fraud did not require *Miranda* warnings because it was not custodial in nature); *see also Mathis v. United States*, 391 U.S. 1, 4 (1968) (requiring *Miranda* warnings before routine tax investigations by IRS agent of inmate in state jail on unrelated charges because such investigations "frequently" lead to criminal prosecutions); *cf. United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) (determining that INS agent's routine interview of jail inmate and inquiry as to his birthplace and citizenship was "solely for the administrative purpose of determining whether [the inmate] was deportable when he got out of jail" and the agent could not have predicted that the defendant would have been re-arrested over a year later after he had been deported and re-entered the United States illegally or that his statement to her would be incriminating). The Eighth Circuit Court of Appeals has noted, however, that "[r]outine questioning by customs officials is normally not custodial interrogation that triggers a *Miranda* warning." *United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir. 1992) (citing *United States v. Troise*, 796 F.2d 310, 314 (9th Cir. 1986)); *id*. (noting that the customs inspector's routine questioning of the defendant, who was not in custody or subject to a coercive atmosphere, "did not transform that routine administrative procedure into a custodial interrogation"); *see also United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (noting that questioning a suspect regarding his name and address for booking purposes did not require *Miranda* warnings as long as the questions were not designed to elicit incriminating admissions (citing *Pennsylvania v.*

*Muniz*, 496 U.S. 582, 601 (1990))). Nonetheless, "a practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation" and requires the prophylactic protections of *Miranda*. *Rhode Island v. Innis*, 446 U.S. at 301.

In *United States v. Layne*, 973 F.2d 1417 (8th Cir. 1992), for example, as soon as the customs inspector had probable cause to believe that the defendant, who was not in custody, was intentionally providing false statements to the administrative questions that the inspector was asking, thereby committing a criminal violation, the inspector gave the defendant *Miranda* warnings. *Layne*, 973 F.2d at 1421. Once the inspector could foresee the possibility that the defendant's responses to questions could be used against her to initiate criminal proceedings, and not simply for customs processing, he warned the defendant of her rights under *Miranda*. *Id.*; *see also United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) ("The investigating officer's subjective intent is relevant but not determinative, because the focus is on the perception of the defendant." (citing *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994))). In *Chen*, 439 F.3d at 1037, the Ninth Circuit Court of Appeals held that, because immigration officials were aware of Defendant's illegal presence in the United States and due to the heightened probability that the prosecutor would pursue criminal charges against the defendant to encourage his testimony in another case, the questioning of the defendant was interrogation requiring *Miranda* warnings. *Id.* at 1042-43.

After SA Cantrell and SA Spalding found the Social Security card in Defendant's wallet, they should have reasonably suspected that their additional questions were "likely to invoke an incriminating response from" Defendant. *Rhode Island v. Innis*, 466 U.S. at 301. ICE agents were originally at the Complex on May 23, 2006, to execute federal search warrants for the purpose of seizing fraudulent Social Security and immigration

documents. When ICE agents did not find all of the individuals who matched the seized documents, SA Cantrell and SA Spalding returned to the Complex the following day. On May 24, 2006, SA Cantrell and SA Spalding saw Defendant in the parking lot of the Complex. SA Cantrell and SA Spalding noticed that Defendant matched the profile of members of a known Mexican gang in the area, he was talking to John Doe who had alerted other illegal aliens of ICE's presence on the previous day and there was fresh gang graffiti at the Complex.

Defendant voluntarily approached SA Cantrell and SA Spalding, and SA Cantrell asked him where he was born. Defendant responded that he was born in Mexico. Upon being asked about documentation, Defendant responded that he had no immigration papers. SA Cantrell and SA Spalding placed Defendant in handcuffs within one minute of their encounter with him.

Then, either SA Cantrell or SA Spalding searched Defendant's person, found his wallet, opened his wallet and found a Social Security card. At that point, SA Cantrell and SA Spalding should have given Defendant his *Miranda* warnings if they wanted to question Defendant about the Social Security card. SA Cantrell knew that the original searches at the Complex were based on probable cause that fraudulent Social Security and immigration documents would be found. SA Cantrell should have reasonably known that questioning Defendant about the validity of the Social Security card could result in incriminating responses, thus triggering *Miranda*. Upon discovering the Social Security card, SA Cantrell knew that Defendant was a Mexican citizen with a Social Security card in his possession but with no immigration documents. SA Cantrell should have known that it would be highly unusual for an undocumented alien to have a valid Social Security card in his pocket. Instead of immediately advising Defendant of his *Miranda* rights, SA

Cantrell and SA Spalding asked Defendant additional questions about the Social Security card and his employment status.

Providing Defendant with his *Miranda* rights at the ICE office after he made un-warned and incriminating statements was ineffective to cure the problem with the pre-*Miranda* statements. *See Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (holding that *Miranda* warnings given mid-interrogation, after defendant gave an un-warned confession, were ineffective). Accordingly, Defendant's objection regarding the *Miranda* warnings is sustained. The Report and Recommendation shall not be adopted. The statements Defendant made to SA Cantrell and SA Spalding after they discovered the Social Security card in Defendant's wallet and prior to Defendant's being advised of his *Miranda* rights shall be suppressed. Any statements Defendant made following the time he was given *Miranda* warnings shall also be suppressed. Such statements are fruits of the poisonous tree.

## *V. CONCLUSION*

For the foregoing reasons, **IT IS HEREBY ORDERED**:

(1) Defendant Daniel Torres-Lona's Response (docket no. 33) to the Report and Recommendation is **SUSTAINED** in part and **OVERRULED** in part;

(2) The Report and Recommendation of August 4, 2006 (docket no. 20) is **SET ASIDE**;

(3) Defendant Daniel Torres-Lona's Motion to Suppress (docket no. 10) is **GRANTED** in part and **DENIED** in part; and

(4) The period between the filing of Defendant's Objections and the filing of this Order is excluded from calculation under the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(F) (excluding delay resulting from the filing of any pretrial motion through the conclusion of the hearing thereon); 18 U.S.C. § 3161(h)(1)(J) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court").

**IT IS SO ORDERED.**

**DATED** this 23rd day of October, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA