**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

DANIEL TORRES-LONA,

          Defendant.

No. 06-CR-72-LRR

**AMENDED AND**
**SUBSTITUTED ORDER**

_____

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . **2**

III.   **ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   **RECONSIDERATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

V.    **FACTUAL FINDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    *A.*    *The Government's Objections* . . . . . . . . . . . . . . . . . . . . . . **4**

    *B.*    *Amended Factual Findings* . . . . . . . . . . . . . . . . . . . . . . . **5**

VI.   **LEGAL CONCLUSIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

    *A.*    *Fourth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

    *B.*    *Fifth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
         *1.*    *The parties' arguments* . . . . . . . . . . . . . . . . . . . . . **13**
         *2.*    *The law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
         *3.*    *Defendant's pre-***Miranda*** statements* . . . . . . . . . . . . . . . **15**
            *a.*    *Whether there was an "interrogation"* . . . . . . . . . . . **15**
            *b.*    *Whether the ICE agents should have known their*
                *questions were "reasonably likely to elicit an*
                *incriminating response"* . . . . . . . . . . . . . . . . . . . **19**
         *4.*    *Defendant's post-***Miranda*** statements* . . . . . . . . . . . . . . **22**

VII.  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

# I. INTRODUCTION

The matter before the court is the government's Motion to Reconsider Order Regarding Defendant's Motion to Suppress ("Motion to Reconsider") (docket no. 37).

# II. RELEVANT PROCEDURAL BACKGROUND

On May 25, 2006, Defendant was charged in a one-count Indictment. Count 1 of the Indictment provides:

> On or about May 24, 2006, in the Northern District of Iowa, in a matter within the jurisdiction of the Bureau of Immigration and Customs Enforcement (ICE), an agency of the United States, [Defendant] DANIEL TORRES-Lona, knowingly and willfully made a false, fictitious and fraudulent material statement and representation, in that [Defendant] claimed orally to an agent of ICE that he had previously worked at a Cedar Rapids business utilizing his assigned Social Security number, when in truth and fact, [Defendant] knew he had worked at the Cedar Rapids business by utilizing a fraudulent Social Security number.
>
> This in violation of Title 18, United States Code, Section 1001.

(docket no. 2) (emphasis in original).

On June 29, 2006, Defendant filed a Motion to Suppress (docket no. 10), in which he sought to suppress physical evidence and statements that were made to ICE agents. On July 3, 2006, the government filed a resistance. On July 5, 2006, Chief Magistrate Judge John A. Jarvey held an evidentiary hearing ("First Hearing"). On August 4, 2006, Magistrate Judge Jarvey filed a Report and Recommendation (docket no. 20), which recommended that Defendant's Motion to Suppress be denied. On August 18, 2006, Defendant filed a timely Response to Magistrate's Report and Recommendation ("Objections") (docket no. 33). On October 23, 2006, the court filed an order which set aside the Report and Recommendation and partially granted Defendant's Motion to Suppress ("Prior Order") (docket no. 35).

On October 26, 2006, the government filed the instant Motion to Reconsider. On that same date, the government filed a Motion to Supplement the Record Regarding Defendant's Motion to Suppress ("Motion to Supplement").

On October 30, 2006, Defendant filed a Resistance to the Plaintiff's Motion to Reconsider ("Resistance") (docket no. 40) and a response to the Motion to Supplement. On that same date, the court granted the Motion to Supplement, admitted Government Exhibit 6 (a Form I-9) and scheduled an additional evidentiary hearing, which took place on November 2, 2006 ("Second Hearing").

At both the First Hearing and the Second Hearing, the government was represented by Assistant United States Attorney Stephanie M. Rose, and Defendant was personally present and represented by attorney Mark C. Meyer. The court finds the matter fully submitted and ready for decision.

### III. ARGUMENTS

In its Motion to Reconsider, the government asks the court to reconsider the Prior Order. Specifically, the government asks the court to deny Defendant's Motion to Suppress. It argues that the court misconstrued the record by including facts in the Prior Order that were not present in the record and by omitting other material facts. Additionally, the government admits that the testimony given by ICE Special Agent Christopher Cantrell ("SA Cantrell") during the First Hearing was confusing.

Before and during the First Hearing, both SA Cantrell and Defendant proceeded on the belief that one of Defendant's pre-*Miranda* statements was the basis for the false statement charge in the Indictment. In fact, the Indictment was based upon statements that Defendant made to SA Cantrell *after* he was given his *Miranda* rights at the ICE office. This was not clear to the court or to Defendant until the Second Hearing.

In his Resistance, Defendant argues that there were no factual errors of significance in the Prior Order. He argues that Defendant should have been given his *Miranda*

warnings after agents seized his wallet and the Social Security card, because they were conducting a criminal investigation. He argues that the late *Miranda* warnings did not cure the agents' failure to warn initially, because the interrogation at the ICE office was both close in time and similar in content to the statements Defendant made before he waived his rights. Alternatively, Defendant argues that his statements should be suppressed because they were the fruits of a warrantless, non-consensual search. He claims that his wallet and the Social Security card inside his wallet were illegally seized.

## IV. RECONSIDERATION

The court may reconsider its Prior Order because an order on a motion to suppress is not a final judgment. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995) ("The district court has the inherent power to reconsider and modify an interlocutory order any time prior to the entry of judgment."); *see also United States v. Valle Cruz*, 452 F.3d 698, 705 (8th Cir. 2006) (explaining that the government has a "right of interlocutory appeal from a district court's decision on a motion to suppress"); *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992) (noting that the "law of the case doctrine" applies only to "issues decided by final judgments" and determining that a district court's rulings on a motion to dismiss and a motion for summary judgment were not "final judgments" and could be reconsidered). Therefore, the court shall reconsider its ruling.

## V. FACTUAL FINDINGS

### A. The Government's Objections

The government makes seven different objections to the findings of fact in the Prior Order; two of the objections claim there was incorrect language in the Prior Order and five of the objections claim there was a material omission of fact. Defendant argues that, even if there were factual errors in the court's Prior Order, the errors are of no significance to the legal conclusions.

### B. Amended Factual Findings

Due to Government Exhibit 6 and the additional evidence presented at the Second Hearing, the court shall set aside and correct the findings of facts in the Prior Order. The court now finds the following facts:

In March or April of 2006, officers from the Cedar Rapids Police Department ("CRPD") investigated a break-in complaint at an apartment in the Cambridge Apartment Complex ("Complex"). The Complex is located at "2135 North Town," Cedar Rapids, Iowa.[1] During the investigation, CRPD officers found evidence of vandalism.

Shortly thereafter, the CRPD officers contacted ICE. They informed ICE agents about the break-in complaint. They told the ICE agents that someone had broken into one of the apartments and the apartment had blood in it, which they believed was the result of a gang's "jumping in" of a new gang member. The CRPD officers explained to the ICE agents that several persons interviewed during the break-in investigation had what appeared to be gang-related tattoos. During the break-in investigation, the CRPD officers saw the number "13" carved into a wall. They believed such carving was consistent with gang activity. The number "13" is used by Hispanic gangs, particularly Mexican gangs, because "M" is the thirteenth letter of the alphabet and the first letter in the word "Mexico."

---

[1] The record is unclear as to the complete address of the Complex. The court notes that there is a "North Town Court NE," a "North Town Place NE" and a "North Town Lane NE" in the city of Cedar Rapids, Iowa. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (noting that the court may take judicial notice of judicial opinions and public records). The exact address of the Complex is not significant for purposes of this order.

After receiving the information from the CRPD officers, SA Cantrell[2] and other ICE agents worked with the CRPD officers to obtain documentation from the landlord of the Complex. Specifically, they sought documents that various tenants had provided to the landlord when the tenants rented their respective apartments. The ICE agents determined that some tenants had presented the landlord with counterfeit documents. They also learned that one tenant had falsely claimed United States citizenship when questioned during the break-in investigation. Based on these discoveries, the ICE agents obtained federal search warrants to search various apartments in the Complex. The warrants were based on the belief that persons in the Complex possessed and used counterfeit Social Security and immigration documents.

On May 23, 2006, the ICE agents executed search warrants at three apartments and obtained consent to search two additional apartments in the Complex. Pursuant to those searches, the ICE agents arrested six undocumented aliens from Mexico. During their searches, the ICE agents found numerous counterfeit Social Security and immigration documents. The names on the documents did not match the people whom the ICE agents arrested on May 23, 2006.

While the searches were progressing, SA Cantrell saw a man who was avoiding the ICE agents ("John Doe"). SA Cantrell interviewed John Doe and learned that he was calling some of the Hispanic residents at the Complex to warn them that ICE agents were present.

On May 24, 2006, SA Cantrell and ICE Special Agent Eric Spalding ("SA Spalding") returned to the Complex to continue their investigation. They were looking for

---

[2] SA Cantrell has had specialized training in the investigation of ethnic gangs. One Hispanic gang SA Cantrell has investigated is the Surenos gang.

Hispanic men in their mid-twenties who matched the Social Security and immigration documents that they seized the previous day. SA Cantrell and SA Spalding were also looking for new graffiti.

When they arrived at the Complex, SA Cantrell and SA Spalding found graffiti that had not been there the previous day on the parking lot in front of one of the apartment buildings. The graffiti read, "Sur 13, fuck you." (July 5, 2006 Hearing Transcript [hereinafter "H.T."] at 11). "Sur 13" is a "Surenos gang tag." (*Id.*). They also saw Defendant, whom they noted was a Hispanic man in his early twenties, coming out of the back of a restaurant next to the Complex. Defendant was wearing baggy pants, a large cubic zirconium earring, a brown bandana and a cocked flat-billed cap. Based on SA Cantrell's experience, Defendant wore clothing and accessories that were similar to those worn by Hispanic gang members in Eastern Iowa. Neither SA Cantrell nor SA Spalding approached Defendant at that time. SA Cantrell and SA Spalding continued their investigation and saw Defendant once more before they left the Complex.

SA Cantrell and SA Spalding drove away from the Complex. However, SA Cantrell and SA Spalding quickly decided that they should return to the Complex to interview Defendant because of the fresh gang graffiti at the Complex, Defendant's attire and the fact that one of the purposes of the investigation was to disrupt gang activity.

SA Cantrell drove back to the Complex and stopped his unmarked vehicle near Defendant. SA Cantrell and SA Spalding got out of the unmarked vehicle and one of the agents asked Defendant to speak with them. SA Cantrell was dressed in blue jeans and a t-shirt, and his firearm and badge were conspicuous on his waistband. Defendant walked over to SA Cantrell and SA Spalding, and he stood three to four feet away from them. Without identifying themselves, SA Cantrell and SA Spalding asked Defendant where he was born, and Defendant replied that he was born in Mexico. SA Cantrell asked Defendant if he had any immigration documents. Defendant responded that he did not

have immigration documents. SA Cantrell and SA Spalding took Defendant into custody and placed him in handcuffs.

After Defendant was taken into custody, either SA Cantrell or SA Spalding searched him and obtained his wallet.[3] SA Cantrell looked inside Defendant's wallet and found a Social Security card which displayed number XXX-XX-5736[4] and the name "Daniel Torres." The card was unsigned, but otherwise appeared to be a valid Social Security card.

Based upon SA Cantrell's eleven years of experience in immigration enforcement, he knew that "illegal aliens do not have a valid Social Security number assigned to them and don't have a valid Social Security card." (H.T. at 16). SA Cantrell knew that an illegal alien might have a valid Social Security card (1) if he had previously been lawfully admitted into the United States and then deported or (2) if he had some previous immigration encounter.

The fact that the Social Security card was unsigned indicated a number of things to SA Cantrell, including that (1) the card belonged to a child who does not yet have the ability to sign his or her name and Defendant was carrying it for the child or (2) Defendant had obtained the card for himself when he was a child and he was unaware of his own immigration status. SA Cantrell anticipated administratively processing Defendant for

_____

[3] It is unclear how SA Cantrell and SA Spalding obtained Defendant's wallet. It is not clear whether Defendant voluntarily gave it to SA Cantrell and SA Spalding or whether they seized it pursuant to a custodial search of Defendant's person. SA Cantrell testified that he could not remember. (H.T. at 30-31). Giving Defendant the benefit of the doubt, the court finds SA Cantrell and SA Spalding conducted some sort of search and retrieved the wallet from Defendant's person. (*See* H.T. at 15-16 ("[D]uring the encounter and ensuing pat-down, we had come across [Defendant's] wallet and learned that he had a Social Security card that appeared to be valid . . . .")).

[4] Pursuant to Local Rule 10.1(h)(1), the court redacts the first five numbers of each of the alleged Social Security numbers mentioned herein.

deportation. SA Cantrell knew that the administrative process would be impacted if, for example, when Defendant was a child, one of his relatives had applied for adjustment of his status to make him a lawful permanent resident, temporary resident or a derivative citizen. If Defendant had previously been registered as an alien in the United States, he would have had an alien registration number and "A-File." If Defendant already had an A-File, the ICE agents would take different steps in the administrative process than they would if he did not have an A-File.

SA Cantrell asked Defendant if the Social Security card (with number XXX-XX-5736) belonged to him.[5] Defendant said that the Social Security card was his card. He also stated that it was a valid card. SA Cantrell then asked Defendant whether he was employed and, if so, where he worked. When asked about his employment status, Defendant told SA Cantrell and SA Spalding that he had been working at Allside Glass through Sedona Staffing, an employment agency. He stated that he had worked under his true and correct name: "Daniel Torres."

SA Cantrell asked Defendant these employment-related questions in an attempt to fully understand Defendant's immigration status. The employment question SA Cantrell posed to Defendant is part of a series of questions ICE agents ask suspected illegal aliens for the purpose of processing an undocumented alien. ICE's Form I-213, which is entitled "Record of Deportable/Inadmissible Alien," provides spaces for, among other information, "Name and Address of (Last) (Current) U.S. Employer," "Type of Employment," "Salary" and "Employed from/to." (Gov't Exs. 4 & 5). The agents did not fill out the Form I-213 until Defendant was delivered to the ICE office.

---

[5] The ICE agents did not give Defendant *Miranda* warnings before asking him about his Social Security card and his employment status. ICE agents generally do not read *Miranda* warnings to suspected illegal aliens when they are being administratively processed for deportation until the ICE agent becomes aware of facts that indicate a crime (other than the crime of being in the country illegally) has been committed.

In an attempt to understand why Defendant, who was claiming to be an illegal alien, had an allegedly valid Social Security card, SA Cantrell and SA Spalding drove Defendant, who remained in handcuffs, to Sedona Staffing. Sedona Staffing is located about three blocks from the Complex. The purpose of taking Defendant to Sedona Staffing was to retrieve other documents that would help the agents verify Defendant's immigration status. SA Cantrell hoped to find additional documentation which would include an alien registration number because, using that number, the agents could accurately research Defendant's status and determine if he had previously registered as an alien in the United States.

SA Cantrell went into Sedona Staffing and asked employee Veronica Rubalcada whether "Daniel Torres" had worked for Sedona Staffing. Ms. Rubalcada did not have an employee file under that name or under Social Security number XXX-XX-5736, the number on the card that the agents had retrieved from Defendant's wallet.

Next, SA Cantrell asked SA Spalding to bring Defendant into Sedona Staffing. He did so. Ms. Rubalcada immediately recognized Defendant when he came into the building and said, "Hi, Danny." Ms. Rubalcada said that Defendant had last worked at Sedona Staffing in 2003. Ms. Rubalcada was unable to locate Defendant's employee file using the name "Daniel Torres" or the Social Security number XXX-XX-5736. At this point, SA Cantrell believed that Defendant had lied to him and that Defendant had committed a criminal offense.

SA Cantrell and SA Spalding transported Defendant to the ICE office. En route to the office, SA Cantrell and SA Spalding further questioned Defendant about working for Sedona Staffing. Defendant maintained that he worked there, despite the fact that Ms. Rubalcada was unable to locate his employment records. SA Cantrell told Defendant that he did not believe that Defendant was providing accurate information and informed

Defendant that there were penalties for providing false information to federal law enforcement officers.

Upon arriving at the ICE office, the agents placed Defendant in the administrative processing area. SA Cantrell advised Defendant of his *Miranda* rights in Spanish and gave Defendant a Form I-214, which is a waiver of rights form that contains a Spanish version of the *Miranda* warnings ("Waiver Form"). On May 24, 2006, at 2:44 p.m., Defendant signed the Waiver Form and stated that he understood his rights.

Defendant then asked SA Cantrell how much time he would serve if he had lied to SA Cantrell. SA Cantrell explained to Defendant that the sentence would be a judge's decision. Defendant explained to SA Cantrell that he had lied about his employment with Sedona Staffing. In a post-*Miranda* statement, Defendant told the agents that he had been employed under the name "Manuel Torres" and that he had used the Social Security number on the card found in his wallet. That is, Defendant stated that he had used Social Security number XXX-XX-5736.

SA Cantrell then attempted to verify the new information with an employee at Sedona Staffing. The Sedona Staffing employee informed SA Cantrell that Defendant had been employed under the name "Manuel Torres" and had used a Social Security card bearing the number XXX-XX-5365. On May 24, 2006, at 3:04 p.m., the Sedona Staffing employee faxed SA Cantrell the Form I-9 that had been completed on May 7, 2003, by Defendant and Mindy Ray, a Sedona Staffing Administrative Assistant. (Gov't Ex. 6). This second number, XXX-XX-5365, appears on the Form I-9 and is a fraudulent Social Security number.

Defendant then admitted purchasing a counterfeit Social Security card and a counterfeit resident alien card in Cedar Rapids in about 2003. He paid $100 for both counterfeit documents. Defendant admitted that he knew the documents were "fake" at the time he bought them, because he knew that buying identification documents from a

private residence was not the proper way to obtain lawful identification documents. Defendant told the agents that he had purchased the counterfeit identity documents in order to obtain employment.

## VI. LEGAL CONCLUSIONS

The court will first examine whether Defendant's Fourth Amendment rights were violated. That is, whether he was subjected to an unlawful search and seizure. Second, the court will exam whether the statements should be suppressed as violations of the Fifth Amendment. It will exam the statements that Defendant made to the ICE agents prior to being given his *Miranda* warnings separately from those that he made following the warning.

### A. Fourth Amendment

Defendant objects to Magistrate Judge Jarvey's failure to address Defendant's assertion that ICE agents improperly seized and searched him in violation of the Fourth Amendment. He argues that, "although [he was] doing nothing suspicious, [he] was detained by the police, placed in handcuffs, searched and questioned about his immigration status." (docket no. 10-2, at 2).

Defendant's argument is misplaced. When the ICE agents initially approached Defendant, they asked him where he was born and if he had immigration documents. These simple questions did not constitute a "seizure." *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Since *Terry* [*v. Ohio*, 392 U.S. 1 (1968)], we have held repeatedly that mere police questioning does not constitute a seizure."). Here, no Fourth Amendment seizure occurred because the ICE agents did not use "physical force" or a "show of authority." *Id.*

When Defendant told SA Cantrell and SA Spalding that he was from Mexico but had no immigration documents, they had probable cause to believe that Defendant was an illegal alien, and they had the authority to place him under arrest. *See* 8 U.S.C. § 1325

(prohibiting aliens from entering the United States, except under the approval of immigration officers). *Cf. United States v. Flores-Sandoval*, 422 F.3d 711, 713-14 (8th Cir. 2005) (concluding that the ICE agents' detention of the defendant was not justified because they had no admissible reason to believe the defendant was an illegal alien). Once he was arrested, the ICE agents could search Defendant and any items found on his body. *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.").

The record is clear that Defendant was in custody at the time he was searched and his wallet was seized. The agents had the authority to conduct a full search of his person and inspect the wallet found in his pocket. *Robinson*, 414 U.S. at 235-36. Accordingly, Defendant's objection regarding this initial search is without merit. SA Cantrell and SA Spalding properly searched Defendant's person and seized the Social Security card bearing number XXX-XX-5736. Defendant's argument that all of his statements should be suppressed as the "fruits of a warrantless, non-consensual search and seizure of his wallet and social security card" is without merit. (docket no. 40, at 7; docket no. 33, at 6-7).

### B. Fifth Amendment

#### 1. The parties' arguments

The confusion in this case arose out of the fact that SA Cantrell and Defendant proceeded in the First Hearing on the belief that the false statement that formed the basis of the Indictment was a statement Defendant made before receiving his *Miranda* warnings at the ICE office. In fact, the charge is based upon Defendant's post-*Miranda* statement that he had previously worked under the Social Security number XXX-XX-5736.[6]

---

[6] The Report and Recommendation was based upon the evidence presented at the First Hearing and, therefore, on the erroneous assumption that the false statement at issue was the one that Defendant allegedly made prior to receiving his *Miranda* warnings. The

(continued…)

13

Defendant claims that he should have been given *Miranda* warnings once the ICE agents found the Social Security card in his possession. He claims that, at that point, their questioning of him was no longer for administrative purposes, and, therefore, he should have been advised of his rights before the agents asked additional questions. The government argues that the ICE agents were not required to read Defendant his *Miranda* rights because the questioning was administrative in nature. That is, the purpose of the questioning was to complete the Form I-213 and administratively process Defendant. The government argues the warnings were not required because "[t]here was no reason to think a crime was involved based on the recovery of [Defendant's] valid Social Security card." (docket no. 37-2, at 5).

### 2. *The law*

"[*Miranda*] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). An individual's right to *Miranda* warnings attaches if the person is being questioned by a law enforcement officer and is in "custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444 (footnote omitted); *see United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005) ("The requirements of *Miranda* arise only when a defendant is both in custody and being interrogated.").

"Interrogation includes both direct questioning by officers and words or actions that officers should know are '"reasonably likely to elicit an incriminating response from the

---

[6](...continued)
court shall set aside the Report and Recommendation because of the confusion that persisted until the Second Hearing.

suspect."'" *Londondio*, 420 F.3d at 783 (quoting *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004), in turn quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The questioning will be "subject to scrutiny," however, "if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged . . . ." *United States v. McLaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985) (citing *United States v. Burns*, 684 F.2d 1066, 1075-76 (2d Cir. 1982)).

Custodial questioning of a suspect does not always rise to the level of interrogation requiring *Miranda* warnings. *United States v. Reyes*, 908 F.2d 281, 287-88 (8th Cir. 1990) (holding that the defendant did not have a right to be read *Miranda* warnings before being asked his name by a pretrial services officer because the officer was completing "routine processing-type questions such as [the defendant's] name, address [and] related matters"); *see McLaughlin*, 777 F.2d at 391 (noting that "a request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating").

### 3.     *Defendant's pre-Miranda statements*

Neither party disputes the fact that Defendant was in custody from the time the ICE agents placed him in handcuffs. In order to determine whether Defendant's pre-*Miranda* statements should be suppressed, the court must determine whether the ICE agents "interrogated" Defendant and whether it was more than "routine questioning."

#### a.     *Whether there was an "interrogation"*

"'Voluntary statements that are not in response to interrogation are admissible with or without the giving of *Miranda* warnings.'" *United States v. Tail*, 459 F.3d 854, 857 (8th Cir. 2006) (quoting *Londondio*, 420 F.3d at 783). Therefore, the fighting issue is whether the questioning by SA Cantrell and SA Spalding constituted "interrogation" requiring *Miranda* warnings. *See Londondio*, 420 F.3d at 783 (noting that *Miranda*'s

requirements are only applicable when an in-custody defendant is interrogated).

The court holds that SA Cantrell and SA Spalding interrogated Defendant prior to administering the *Miranda* warnings. Defendant's statements regarding the Social Security card and his employment at Sedona Staffing were not "spontaneous" statements. Each time Defendant spoke, it was in response to a question posed by SA Cantrell or SA Spalding. The ICE agents were not making casual conversation. *Cf. Tail*, 459 F.3d at 858 ("Polite conversation is not the functional equivalent of interrogation."). Instead, the ICE agents were in the midst of a criminal investigation involving gang activity and counterfeit Social Security and immigration documents. SA Cantrell testified that, on May 23, 2006, ICE agents executed three search warrants for apartments at the Complex based upon probable cause that the crimes of "possession and use of counterfeit immigration and Social Security documents" were occurring there and that, on May 24, 2006, the agents returned to the complex "to follow up on that criminal investigation." (H.T. at 26-27).

This case is unlike the cases in which the Eighth Circuit Court of Appeals has found that there is no interrogation for *Miranda* purposes. In *United States v. Fleck*, 413 F.3d 883 (8th Cir. 2005), for example, a law enforcement agent was transporting defendants from the county jail to federal custody when he asked them how they liked the food in the county jail. *Id.* at 893. The Eighth Circuit Court of Appeals held that their incriminating responses were voluntary and not made during "interrogation" because the agent's question was not "calculated to elicit incriminating responses." *Id.* at 893.

Similarly, in *United States v. Chipps,* 410 F.3d 438 (8th Cir. 2005), the Eighth Circuit Court of Appeals upheld the district court's finding that the defendant's statements were voluntary and spontaneous. *Id.* at 444. In *Chipps*, an agent who was fingerprinting the defendant stated that he had been one of the officers who had tried to stop the defendant while he was driving on the interstate the previous day. *Id.* The defendant

stated he would have stopped if the officers would have identified themselves. *Id.* Then, there was about a minute of silence between the agent and the defendant. *Id.* Next, the defendant admitted that he knew a specific FBI agent had been looking for him. *Id.* at 444-45. Although the defendant was in custody, the Eighth Circuit Court of Appeals held that the defendant had not been "interrogated" because the defendant made spontaneous statements that were not in response to a conversation initiated by the officer. *Id.* at 445. The initial statement by the agent "was not likely to elicit incriminating evidence; it was a statement of fact not a plea to the conscience, and it was not accompanied by any threats or other coercive pressure." *Id.*

After SA Cantrell and SA Spalding found the Social Security card in Defendant's wallet, they should have reasonably suspected that their additional questions were "likely to invoke an incriminating response from" Defendant. *Innis*, 466 U.S. at 301. ICE agents were originally at the Complex on May 23, 2006, to execute federal search warrants for the purpose of seizing fraudulent Social Security and immigration documents. When ICE agents did not find all of the individuals who matched the seized documents, SA Cantrell and SA Spalding returned to the Complex the following day. On May 24, 2006, SA Cantrell and SA Spalding saw Defendant in the parking lot of the Complex. SA Cantrell and SA Spalding noticed that Defendant matched the profile of members of a known Mexican gang in the area, he was talking to John Doe who had alerted other illegal aliens of ICE's presence on the previous day and there was fresh gang graffiti at the Complex.

Defendant voluntarily approached SA Cantrell and SA Spalding when they first spoke to him, and SA Cantrell asked him where he was born. Defendant responded that he was born in Mexico. Upon being asked about documentation, Defendant responded that he had no immigration papers. Defendant was not in "custody" at this point. *See United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (explaining that to determine whether a person is in custody for *Miranda* purposes, a court must examine how a

reasonable person in the defendant's position would have understood his situation); *see also United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990) (explaining that the "relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation"). Upon hearing Defendant's answers, however, SA Cantrell and SA Spalding handcuffed Defendant and placed him into custody.

Then, either SA Cantrell or SA Spalding searched Defendant's person, found his wallet, opened his wallet and found the Social Security card. At that point, the interrogation began. SA Cantrell knew that the original searches at the Complex were based on probable cause that fraudulent Social Security and immigration documents would be found. SA Cantrell should have reasonably known that questioning Defendant about the validity of the Social Security card could result in incriminating responses. The ICE agents were, after all, following-up on a criminal investigation involving possession and use of counterfeit Social Security and immigration documents.

Moreover, the court may consider SA Cantrell's subjective intent. *See Reyes*, 908 F.2d at 292 ("The test is an objective one, although the subjective intent of the questioning agent is relevant."); *see also United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) ("The investigating officer's subjective intent is relevant but not determinative, because the focus is on the perception of the defendant."). By the time the three men left the Sedona Staffing office, SA Cantrell believed that Defendant had lied to him and, thus, had committed a federal offense. In the Second Hearing, SA Cantrell stated that he determined that Defendant may have committed a "prosecutable criminal offense" when they were unable to verify Defendant's work history at Sedona Staffing based upon Defendant's representations. SA Cantrell's belief that a crime had been committed is supported by the fact that, during the ride from the Sedona Staffing office to the ICE office, the ICE agents told Defendant "that there were penalties for telling lies to federal law enforcement

officers." (Gov't Ex. 5). The agents would not have made such a statement unless they believed that Defendant had lied to them. Therefore, at the very least, the interrogation began when the ICE agents left the Sedona Staffing office.

### b. Whether the ICE agents should have known their questions were "reasonably likely to elicit an incriminating response"

The government argues that the ICE agents were not required to give Defendant *Miranda* warnings because their questions were being posed for processing and administrative purposes and not for the purpose of seeking evidence in a criminal matter. For the reasons set forth above in Part IV(C)(2)(c)(I), the government's argument fails.

The court acknowledges that "[r]outine questioning by customs officials is normally not custodial interrogation that triggers a *Miranda* warning." *United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir. 1992) (citing *United States v. Troise*, 796 F.2d 310, 314 (9th Cir. 1986)); *see also id*. (noting that the customs inspector's routine questioning of the defendant, who was not in custody or subject to a coercive atmosphere, "did not transform that routine administrative procedure into a custodial interrogation"). Additionally, the court recognizes that there is a "booking exception" to *Miranda*; "*Miranda* warnings are not required before the asking of routine booking questions to gather background biographical information." *Reyes*, 908 F.2d at 292-93 (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990)). However, as stated above, this is a case involving more than mere "routine" questioning by the ICE agents.[7] *See id*. (explaining that the booking

---

[7] The court has examined each of the cases cited by the parties and finds the cases cited by the government are not controlling. For example, the government relies upon *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), a case in which the Supreme Court determined that individuals involved in deportation hearings are not entitled to the same "protections that apply in the context of a criminal trial" because deportation hearings are "civil" proceedings. *Id*. at 1038. This and the other cases cited by the government which discuss the "civil nature" of deportation hearings are inapposite, because the government seeks to use Defendant's statements against him in this criminal case. *See, e.g.*, *Bustos-Torres v.*
(continued…)

exception does not apply where the "questions are reasonably likely to elicit an incriminating response in a particular situation").

Miranda's requirement applies to all custodial interrogations where criminal prosecutions *could* result, even if the interrogation is administrative in nature. *See Mathis v. United States*, 391 U.S. 1, 4 (1968) (requiring *Miranda* warnings before routine tax investigations by IRS agent of inmate in state jail on unrelated charges because such investigations "frequently" lead to criminal prosecutions). In *United States v. Layne*, 973 F.2d 1417 (8th Cir. 1992), for example, a customs inspector conducted an interview of an individual who was not in custody. *Id.* at 1421. The questions were administrative in nature. *Id.* As soon as the customs inspector had probable cause to believe that the interviewee was intentionally providing false statements, thereby committing a criminal violation, the inspector gave the interviewee *Miranda* warnings. *Id.* Once the inspector could foresee the possibility that the interviewee's responses to questions could be used against her to initiate criminal proceedings, and not simply for customs processing, he warned the interviewee of her rights under *Miranda*. *Id.*

In *United States v. Chen*, 439 F.3d 1037 (9th Cir. 2006), the defendant was a citizen of China who was discovered, along with thirteen other illegal aliens, in an apartment in Guam. *Id.* at 1038. Agents found the defendant when they were executing a search warrant in a criminal investigation of a suspected alien smuggler. *Id.* Agents knew that the prosecutor was willing to pursue criminal charges against the defendant in order to procure the defendant's testimony against the suspected smuggler. *Id.* After the

---

[7](…continued)

*INS*, 898 F.2d 1053, 1056 (5th Cir. 1990) (determining that a form that was prepared by an immigration officer was admissible at a deportation proceeding despite the lack of a *Miranda* warning and explaining that "*Miranda* warnings are not required in the deportation context, for deportation proceedings are civil, not criminal in nature, and the Sixth Amendment safeguards are not applicable").

defendant sat in administrative custody for two days, the agents provided the defendant with notice that he had been arrested because the agents believed that he was in the United States illegally. *Id.* The agents questioned him about how he arrived in Guam. *Id.* At the time of the questioning, one agent knew that the defendant had an attorney, but the agent did not call the attorney. *Id.* at 1039. The defendant was not given *Miranda* warnings prior to the questioning. *Id.* The Ninth Circuit Court of Appeals examined the totality of the circumstances and held that the questioning of the defendant constituted an "interrogation," which triggered the need to administer *Miranda* warnings. *Id.* at 1042-43. It affirmed the district court's oral decision, in which the district court "emphasized that a *Miranda* warning was required because illegal presence in the United States is a crime, [the defendant] was believed to have committed that crime, he was in custody because of INS agents' suspicion that he had committed that crime, and the agent's questions related to that crime." *Id.* at 1039-40.

Similarly, Defendant should have been given his *Miranda* warnings when the ICE agents discovered the Social Security card in his wallet and, at the very latest, when Ms. Rubalcada was unable to find employment records for "Daniel Torres" or for Social Security number XXX-XX-5736. In these circumstances, the discovery of the Social Security card indicated a violation of 18 U.S.C. § 1028(a)(6), which prohibits the knowing possession of a United States identification document "produced without lawful authority." The fact that Ms. Rubalcada was unable to locate records for Defendant indicated a violation of 18 U.S.C. § 1001, which prohibits making false statements to federal officers. The ICE agents had reason to believe that Defendant had committed one or more criminal violations long before they administered his *Miranda* rights.

The statements Defendant made between the time he was taken into custody and the time he was read his *Miranda* rights and signed the Waiver Form shall be suppressed.

### 4.    *Defendant's post-Miranda statements*

The statements Defendant made after SA Cantrell advised him of his *Miranda* rights and he signed the Waiver Form may be admissible, even though the court has determined that the prior statements should be suppressed.

According to the "fruit of the poisonous tree" doctrine, evidence that is obtained by the illegal actions of law enforcement officers must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). However, a post-waiver statement "need not be suppressed merely because it was the fruit of an earlier *Miranda* violation." *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1013 (8th Cir. 2003). The Supreme Court warned that

> [i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad v. Oregon*, 470 U.S. 298, 309 (1985).

The court, therefore, analyzes Defendant's post-waiver statements "under the standard of voluntariness." *Villalba-Alvarado*, 345 F.3d at 1013.

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that

> the suspect made a rational and intelligent choice whether to
> waive or invoke his rights.

*Elstad*, 470 U.S. at 314.

> "A waiver is 'knowing and intelligent' where it is made with
> full awareness of both the nature of the right being abandoned
> and the consequences of abandoning the right, and a waiver is
> 'voluntary' where the court can determine that the waiver was
> a product of the suspect's free and deliberate choice, and not
> the product of intimidation, coercion, or deception."

*United States v. Annis*, 446 F.3d 852, 855 (8th Cir. 2006) (quoting *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2000)). "A statement is not voluntary if the totality of the circumstances shows [Defendant's] will was overborne." *Id.*

The court finds that the ICE agents did not use coercive or improper tactics to obtain either the pre-*Miranda* or post-*Miranda* statements. Defendant made a rational and intelligent choice to waive his rights after SA Cantrell read him his rights in Spanish at the ICE office. The totality of the circumstances show that Defendant was not intimidated, coerced or deceived. The opposite is true. Defendant initially lied to the ICE agents by telling them he was employed by Sedona Staffing under his true name. After he was taken to the ICE office for processing, he allegedly lied to the federal agents, telling them he used Social Security number XXX-XX-5736 to gain employment. Defendant does not claim that the ICE agents used "deliberately coercive or improper tactics," and he failed to produce any evidence of such tactics. *Elstad*, 470 U.S. at 314; *see Villalba-Alvarado*, 345 F.3d at 1013 ("Because Defendant argues neither that his unwarned statement was actually compelled nor that some governmental action (beyond the initial failure to warn) made his post-waiver statement involuntary, we find the entirety of his post-waiver statement admissible."). Defendant's will was not "overborne." *Annis*, 446 F.3d at 855. The false statement at issue was not made until after Defendant was warned and knowingly, voluntarily and intelligently waived his *Miranda* rights by signing the Waiver

Form at about 2:44 p.m. on May 24, 2006. Therefore, because Defendant does not argue that his post-*Miranda* statement was compelled (i.e., that it was involuntary) and because the court can find no evidence of compulsion in the record, the court concludes that Defendant's post-waiver statements are admissible.

Defendant argues that his rights waiver at the ICE office was invalid because the discussion following the waiver was close in time and similar in content to the discussion prior to Defendant's arrival at the ICE office. Defendant relies upon *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, the Supreme Court confronted the police "strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession." *Id.* at 609. The Supreme Court held that, when officers withhold giving a suspect *Miranda* warnings until after they have elicited a confession from the suspect, new warnings will not cure the initial failure to warn. *See id.* at 613 ("[I]f the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation [that is] close in time and similar in content."). The Supreme Court explained that the warnings would not be effective in a "question-first" situation: "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* (footnote omitted).

*Seibert* is distinguishable. In *Seibert*, a law enforcement officer arrested the suspect at 3:00 a.m. as she was sleeping by her son's hospital bed, took her to the police station, left her alone in an interview room for fifteen to twenty minutes, questioned her for thirty to forty minutes (during part of which the officer squeezed her arm and repeated the confession he wanted her to make), obtained a confession and gave her a twenty-minute break. *Id.* at 604-05. The officer then gave the suspect her *Miranda* warnings for the first

time, obtained a signed waiver and questioned her until she repeated her confession. *Id.* at 605. Additionally, the officer in *Seibert* testified that he made a conscious decision to employ the question-first method. *Id.* at 605-06.

Here, there was not a "coordinated and continuing interrogation" like the one at issue in *Seibert*. *Id.* at 613. Unlike the officer in *Seibert*, neither SA Cantrell nor SA Spalding had any bad intent or plan to elicit a criminal confession from Defendant prior to warning him. The court finds that the ICE agents' failure to warn Defendant was merely an oversight. Indeed, Defendant never confessed to committing a crime prior to the time he waived his rights. Unlike the situation in *Seibert*, this was not a traditional confession. After he had been warned of his *Miranda* rights, Defendant, for the first time, allegedly made a statement to federal officers that was not true. He neither made the allegedly false statement nor asked questions about the ramifications of lying until after he had been warned. Defendant's reliance on *Seibert* is misplaced.

## VII. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**:

(1) The court's Prior Order (docket no. 35) is **SET ASIDE**;

(2) Defendant's Response to Magistrate's Report and Recommendation (docket no. 33) is **OVERRULED IN PART** and **GRANTED IN PART**;

(3) Defendant's Motion to Suppress (docket no. 10) is **DENIED in part** and **GRANTED IN PART**;

(4) The August 4, 2006 Report and Recommendation (docket no. 20) is **NOT ADOPTED**;

(5) The government's Motion to Reconsider (docket no. 37) is **GRANTED**;

(6) The statements Defendant made on May 24, 2006, between the time he was placed into custody and the time he waived his *Miranda* rights by signing the Waiver Form at 2:44 p.m. are **SUPPRESSED**; and

(7)     The periods during which Defendant's Motion to Suppress, Defendant's objections to the Report and Recommendation and the government's Motion to Reconsider were under advisement are excluded from calculation under the Speedy Trial Act.  *See* 18 U.S.C. § 3161 (h)(1)(F) (excluding delay resulting from the filing of any pretrial motion through the conclusion of the hearing thereon); 18 U.S.C. § 3161(h)(1)(J) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court").

**IT IS SO ORDERED.**

**DATED** this 9th day of November, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA